## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| TERESA ULMER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO.  1:04-CV-00251** |
| | ) | |
| FORT WAYNE COMMUNITY SCHOOLS, | ) | |
| et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

## I.  INTRODUCTION

On December 18, 2003, Plaintiff Teresa Ulmer, an employee of Defendant Fort Wayne
Community Schools ("FWCS"), was accused of stealing a co-worker's wallet.  She brings this
suit under 42 U.S.C. § 1983 against FWCS and each member of its Board of Trustees in his or
her official capacity,[1] contending that FWCS violated her procedural due process rights when it
(1) suspended her without pay pending an investigation and failed to provide a timely post-
suspension hearing, and (2) after a pre-termination hearing, failed to provide a timely decision on
the status of her employment.[2]  (Am. Compl. ¶¶ 31-35.)  Ulmer also asserts a claim under Article
One, Section Twelve of the Indiana Constitution for alleged injury to her reputation caused by
actions of FWCS relating to the suspension.[3] (*Id*. ¶¶ 44-47.)

---

[1]Because Ulmer is suing each member of the Board of Trustees in his or her official capacity, only one
defendant exists – FWCS. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

[2]Accordingly, subject matter jurisdiction arises under 28 U.S.C. § 1331.   Jurisdiction of the undersigned
Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

[3]Ulmer also initially advanced claims that Defendants violated her substantive due process rights and her
liberty interest without due process of law, but the parties have since stipulated to dismiss these claims.  (Am.
Compl. ¶¶ 37-38, 40-43; Docket # 32.)

Before the Court is Defendants' motion for summary judgment, which argues that Ulmer's claims must fail because (1) sufficient due process was afforded to Ulmer under the circumstances, as much of the delay was attributable to Ulmer's own activities, and (2) Ulmer's alleged due process violations did not occur pursuant to a "policy or custom" of FWCS. (Docket # 34.)  After considering the motion and the relevant law, the Court finds that Defendants' motion for summary judgment should be GRANTED.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Ulmer has been employed by FWCS for approximately fourteen years, most recently serving as a purchasing secretary at FWCS's Anthis Career Center ("Anthis"). (Am. Compl. ¶ 14.)  On Thursday, December 18, 2003, Theresa Oberley, a co-worker of Ulmer's at Anthis, contacted Brenda Brown, a manager in FWCS's employee relations department, and accused Ulmer of theft. (Aff. of Brenda Brown ¶ 3; Dep. of Brenda Brown at 11.)  Specifically, Oberley told Brown that on the evening of Friday, December 12, 2003, Oberley discovered that her wallet was missing from her purse. (Brown Aff. ¶ 3; Brown Dep. Ex. E.)  After retracing her steps that day, Oberley concluded that the wallet must have been stolen from her office between 2:18 p.m. and 3:05 p.m. that same day. (*Id*.)  Upon discovering the theft, Oberley called her credit card companies and found that someone had obtained two cash advances on her credit cards that afternoon: one of $4,500 from Salin Bank, and another of $2,500 from National City Bank. (*Id*.)  The next day,  Saturday, December 13, 2003, Oberley obtained a description of the thief from the teller at Salin Bank, and on the following Wednesday, December 17, 2003, Oberley viewed a still shot taken from a security camera at Salin Bank. (*Id*.)  Based on both the teller's description and the still photo, Oberley was convinced that Ulmer was the person who

2

obtained the cash advance on her credit cards at the respective banks. (Brown Aff. ¶ 3; Brown Dep. at 11.)

After hearing Oberley's account, Brown determined that Oberley and her evidence were credible.[4] (Brown Aff. ¶ 4; Brown Dep. at 11.)  Based on the seriousness of the charge and Oberley's evidence, Brown decided to call Ulmer down to the employee relations department that same day. (*Id.*)  Her intention was to notify Ulmer of the charge and give her a chance to respond to it, and, unless Ulmer offered evidence to warrant reconsideration, suspend Ulmer without pay pending an investigation. (*Id.*)  Per standard practice, Brown arranged for a union representative to be present to assist Ulmer.[5] (Brown Aff. ¶ 5; Brown Dep. at 8-9.)  After Ulmer received the request to report to the employee relations department, she began raising her voice and showing signs of panic. (Brown Dep. at 12-13.)

Despite initially refusing to report to the meeting, Ulmer ultimately did attend, but was visibly upset. (*Id.* at 14, Ex. E.)  Brown told Ulmer that Oberley had accused Ulmer of stealing her wallet, explaining that Oberley had identified Ulmer from bank surveillance photos. (Brown Aff. Ex. B.; Brown Dep. at 14-16.)  Ulmer denied that she stole the wallet, emphasizing that she had no motive because she had recently inherited a large sum from her mother. (Brown Dep. at 14, 19, Ex. E.)  She further reported that after taking Anthis's mail to its drop-off point after work on December 12, she went home to see her children. (*Id.* at 15, 67, Ex. E.)

---

[4]The following day, December 19, 2003, the last day before the holiday break at FWCS, Brown obtained a written statement from Oberley confirming the information that she had earlier provided. (Brown Aff. ¶ 7, Ex. B; Brown Dep. at 20-21.)

[5]At all relevant times, Ulmer was a member of  Local No. 561 of the American Federation of State, County, and Municipal Employees Representing Secretaries, Media Clerks, Assistants, and Clerks ("AFSCME"). (Brown Aff. ¶ 5.)

Based on what she heard at the meeting, Brown stuck to her original plan of suspending Ulmer without pay pending an investigation. (Brown Aff. ¶ 6.)  All told, the meeting with Ulmer lasted approximately thirty to forty minutes. (Brown Dep. at 17.)  That same day, Brown confirmed Ulmer's suspension via letter, informing Ulmer that she was not to enter FWCS's premises without permission and was prohibited from contacting any employees, parents, or students of FWCS while the investigation was pending. (*Id*. at 19-20; Am. Compl. Ex. 1.)

Between December 19, 2003, and January 5, 2004, Brown was out of the office for the holidays and did not conduct any further investigation (Brown Dep. at 21); likewise, during the same time period, Ulmer went on a previously scheduled two-week trip to Texas (*Id*. at 14; Ulmer Dep. at 55).  During the holidays, the employee relations department received a letter dated December 24, 2003, from attorney Doug Ulmer, informing FWCS that he was representing Ulmer. (Brown Aff. ¶ 8, Ex. C.)

On January 5, 2004, Brown's first day back in the office, she met with Officer Jennings, a FWCS employee who handles security at Anthis, to review the surveillance tapes from Anthis for December 12, 2003. (Brown Dep. at 29; FWCS Interrog. Resp. No. 4.)  Jennings pointed out that Ulmer left and returned to Anthis during the time frame that the wallet was allegedly stolen; however, according to Jennings, Ulmer left for her smoke break at that time every day. (Brown Aff. ¶ 9, Exs. D, E; Brown Dep. at 29.)  Ulmer was then seen leaving for the day at 3:14 p.m., wearing a black coat and sunglasses perched on top of her head, with her hair pulled back. (Brown Aff. ¶ 9, Ex. F; Brown Dep. at 29-30.)

The next day, January 6, 2004, Brown visited the New Haven Police Department with Oberley to view the original surveillance photos from Salin Bank; Oberley again confirmed that

she believed Ulmer was depicted in the photos. (Brown Dep. at 23, Ex. E.)  While Oberley was convinced that the photos identified Ulmer, the bank tellers never positively identified her as the thief. (Brown Dep. at 81; Designation of Evidence in Supp. of Pl.'s Resp. ¶ 13.)  In fact, the detective working the case stated "that it was unlikely any charges could be pursued as none of the witnesses could make an identification." (Designation of Evidence in Supp. of Pl.'s Resp. ¶ 13.)

Sometime between January 6, 2004, and January 15, 2004, Brown's office began to schedule interviews with Ulmer's co-workers as part of the investigation. (Brown Dep. at 31, 33, Ex. E.)  On January 15, 2004, Brown interviewed Toni Printzos, Ulmer's co-worker. (*Id*. at 34, Ex. E.)  Among other things, Printzos told Brown that she regularly overheard Ulmer talking to bill collectors, assuring them they would be paid. (*Id*. at 35-36, Ex. E.)  Also, when Brown showed Printzos copies of the bank surveillance photos and asked if she could identify the person depicted therein, Printzos immediately responded, "Oh my god, that looks like Teresa Ulmer." (*Id*. at 35; Dep. of Toni Printzos at 19.)  In particular, Printzos noted that Ulmer's face resembled the person in the photos, that Ulmer frequently wore scarves around her coats, and that she wore her hair up like the person in the photos. (Printzos Dep. at 19-20, Ex. E.)

On January 16, 2004, Brown interviewed Terri Zoch and Lisa York, other co-workers of Ulmer. (Brown Dep. at 38, 40, Ex. E.)  Zoch told Brown that co-workers had reported that Ulmer had money problems. (*Id*.)  When asked whether she could identify the person in the bank surveillance photos, Zoch said "it looks like Teresa Ulmer," noting that in addition to the physical similarity between Ulmer and the person in the bank surveillance photos, Zoch also remembered that Ulmer owned a vertically striped scarf like the one worn by the person in the

photos. (Dep. of Terri Zoch at 20-22, Ex. E.)  Also, on December 18, 2003 (the same day Oberley reported the theft to Brown), York overheard Ulmer in a conversation with the New Haven Police Department in which Ulmer became very angry and used a lot of profanity. (Brown Dep. at 38, Ex. E; Dep. of Lisa York at 15.)  Additionally, earlier that school year, York overheard Ulmer discussing money problems on the telephone. (Brown Dep. at 38, Ex. E.) When York was asked if she could identify the person in the bank surveillance photos, she stated: "Oh my gosh, that looks like the lady I work right next to, [Teresa Ulmer]," confiding that the resemblance – specifically the facial expression and features, the sunglasses on top of the head, and the dark coat with a scarf – gave her "cold chills." (York Dep. at 5, 15-16.)

On January 21, 2004, Brown obtained copies of the written statements of the tellers at the banks. (Brown Dep. at 26.)  In his statement, Ralph Williams of Salin Bank described the thief as of caucasian race, about 5'6" tall, blondish-brown hair, and a complexion that had once experienced bad acne. (*Id.* at 26; Brown Aff. Ex. G.)  In Brown's view, this description matched Ulmer, as in particular, Brown noted that Ulmer has pockmarks on her face. (Brown Aff. ¶ 11, Ex. G; Brown Dep. at 26.)

On February 2, 2004, Brown interviewed Deb Thomas, another one of Ulmer's co-workers. (Brown Dep. at 42, Ex. E.)  Thomas told Brown that on December 18, 2003, Ulmer demanded to see Larry Gerardot, the principal at Anthis, and became angry when she learned that he was absent; Thomas also overheard a phone call that day in which Ulmer used profanity. (*Id.* at Ex. E.)  In addition, Thomas positively identified Ulmer as the person in bank surveillance photos, and told Brown that one of the bank receipts appeared to be in Ulmer's handwriting. (*Id.* at 45, Ex. E.)

6

On February 4, 2004, Brooke Aschliman, Brown's assistant in the employee relations department, interviewed Gerardot. (*Id*. at 45-46, Ex. E.)  Aschliman reported to Brown that during the interview, Gerardot also identified Ulmer as the person in the bank surveillance photos, specifically commenting that Ulmer owned a black coat similar to that worn by the person in the bank photos and, after the theft, Ulmer began to wear a red coat. (*Id*. at 47, Ex. E.)

Sometime around February 4, 2004, a follow-up meeting with Ulmer was scheduled for February 20, 2004, a date mutually convenient for all of the parties; for unknown reasons, the meeting was delayed until February 23, 2004. (*Id*. at 52; Brown Aff. ¶ 13; Dep. of Doug Ulmer at 9-11.)  Doug Ulmer never requested that the meeting take place any earlier than it did; rather, he specifically noted that he was particularly busy during that time frame. (Doug Ulmer Dep. at 7-8, 12.)  From Brown's perspective, the purpose of the meeting was to ask Ulmer questions based on the investigation that had been completed and to allow Ulmer another chance to tell her side of the story. (Brown Aff. ¶ 14.)  From Doug Ulmer's perspective, the purpose of the meeting was for FWCS to communicate the outcome of its investigation. (Doug Ulmer Dep. at 12-13.)

Ulmer, Doug Ulmer, Brown, FWCS attorney Bill Sweet, and Larry Gerardot attended the February 23 meeting. (Brown Aff. ¶ 14.)  Upon seeing Ulmer, Brown believed that Ulmer had changed her appearance since December 18, 2003; specifically, Brown noted that Ulmer's hair had changed from bleached-blonde to brown and, instead of it being pulled back in a pony tail with no bangs, Ulmer's hair was now loose and had bangs. (Brown Dep. at 89.)  Brown found these changes significant. (*Id*. at 89.)  As the meeting began, it became clear that FWCS wanted to elicit information from Ulmer regarding the events of December 12, 2003. (*Id*. at 52-54; Doug

7

Ulmer Dep. at 14.)  Since Doug Ulmer was concerned that a criminal investigation might be ongoing, he instructed Ulmer not to speak. (Doug Ulmer Dep. at 14.)  As a result, the meeting lasted only a few minutes. (Brown Aff. ¶ 14.)

The next contact between Doug Ulmer and Brown was a letter dated March 11, 2004, in which Doug Ulmer indicated for the first time that Ulmer was in a tanning booth on December 12, 2003, from approximately 3:25 to 3:55 p.m., and that additional documentation would follow. (Brown Dep. at 56; Am. Compl. ¶ 19, Ex. 6.)  Ulmer recalled this visit to the tanning booth sometime in March of 2004, after Doug Ulmer asked her to think about where she had been that day. (Ulmer Dep. at 88.)  The next day Doug Ulmer sent another letter stating that Ulmer was at the tanning booth at 3:19 p.m., for approximately twenty minutes, together with computer documentation purportedly confirming this timing. (Brown Dep. at 56-58, Am. Comp. ¶¶ 18,  20, Ex. 7.)

Brown considered Doug Ulmer's letter to be Ulmer's response to the allegations against her. (Brown Dep. at 66-67.) Brown was skeptical of the alibi evidence, because it appeared approximately three months after Ulmer's suspension, after Ulmer was given two other opportunities to bring this information forward. (*Id*. at 68-69.)  In light of all the other evidence, Brown decided that Ulmer should be recommended for termination because of the alleged theft and other inappropriate conduct at Anthis that violated FWCS's work rules and employee code of ethics.[6] (*Id*. at 69; Brown Aff. ¶ 15, Ex. J.)  Notice of this recommendation was issued on

---

[6]FWCS cited the following violations as its basis for recommending Ulmer's termination: (1) immoral conduct or indecency; (2) theft or conversion of school property or equipment, or the property or equipment of a school employee, or theft occurring during work hours; (3) use of profanity; and (4) leaving early without approval of supervisor. (Brown Aff. ¶ 15, Ex. J; Brown Dep. at 69.)

March 19, 2004, via letters to Ulmer from Gerardot and to Doug Ulmer from Brown. (*Id*.; Am. Compl. ¶ 21, Ex. 2.)

Although not expressly required under the AFSCME contract, FWCS has a practice of affording pre-termination hearings to AFSCME employees. (Brown Aff. ¶ 16.) In keeping with this practice, Brown sent Ulmer a follow-up letter indicating that she had the right to a pre-termination hearing, and on March 26, 2004, John Theisen, Ulmer's new counsel, requested a hearing on the recommended termination. (*Id*. ¶ 16, Ex. K.) In the days that followed, Brown's office attempted to schedule the hearing; however, it was difficult to ascertain a mutually convenient time for everyone, particularly Sweet and Theisen. (*Id*. ¶ 16.) The hearing was ultimately scheduled for May 5, 2004, but was then later rescheduled for May 7, 2004, at FWCS's request. (*Id*.) At no time did Theisen request an expedited hearing or object to the timing of the hearing. (*Id*.)

At the May 7 pre-termination hearing, both sides presented testimony and exhibits, had the chance to cross-examine witnesses, and offered opening and closing statements. (*Id*. ¶ 17.) A key witness produced by Ulmer was an employee of the tanning salon who testified that he recalled seeing Ulmer at the tanning salon on the afternoon of December 12, 2003, and that he had written documentation (computer records and a sign-in sheet) from the tanning salon showing that Ulmer was indeed at the salon during the time the theft occurred. (Designation of Evidence in Supp. of Pl.'s Resp. ¶ 12 at 21-25.) At the hearing, Brenda Singleton, the hearing officer, indicated that she would rule in fourteen days; however, Singleton later deferred her decision pending a discussion among the parties regarding whether Ulmer would submit to a lie

detector test.[7] (*Id.* at ¶ 10; Brown Aff. ¶ 17.)  On June 30, 2004, Ulmer filed this action, and on August 24, 2004, citing lack of sufficient evidence presented at the hearing and the failure of the parties to agree on the terms of a lie detector test, Singleton decided to defer her decision until resolution of this suit, thus "allow[ing] the courts to decide on the ruling to this case." (Compl.; Designation of Evidence in Supp. of Pl.'s Resp. ¶ 11.)

To date, Ulmer has not submitted to a lie detector test and has not received a final decision regarding the status of her employment.[8] (Am. Compl. ¶ 28.)  However in a letter dated May 4, 2005, Singleton informed the parties that she would now rule on the matter while this suit is pending, due to Ulmer's contention that Singleton's delay is violating her due process rights. (Designation of Evidence in Supp. of Pl.'s Resp. ¶ 12.)  Accordingly, she allowed thirty days for the parties to submit additional evidence for her consideration prior to rendering a decision.[9] (*Id.*)          Notably, the collective bargaining agreement between AFSCME and FWCS includes a grievance procedure. (Brown Aff. ¶ 5, Ex. A.)  Under the procedure, a grievance is defined as "a difference between the administration and an employee involving an alleged violation, misinterpretation or misapplication of the provision [sic] contained in this contract." (*Id.* at 7 of Ex. A.)  Although there are various steps in the grievance process, ultimately, an employee who files a grievance has a right to submit the matter to binding

_____

[7]Brenda Singleton's correspondence indicates that she is a "Manager" working under the umbrella of the "Human Resource Department, Support Services" of FWCS. (Designation of Evidence in Supp. of Pl.'s Resp ¶¶ 9-11.)

[8]Ulmer also alleges that FWCS communicated to its teachers and employees that Ulmer was terminated because she was a thief, and posted a photograph of Ulmer at Anthis with a notice to employees to contact security or police if Ulmer was seen on the premises. (Am. Compl. ¶ 29.)  However, as will be discussed *infra*, Ulmer fails to provide evidence to support this assertion.

[9]As of this writing, the record does not indicate whether the parties submitted additional evidence for Singleton's consideration, or if Singleton rendered a determination.

arbitration. (*Id*. at 8 of Ex. A.)  To date, Ulmer has not filed a grievance as a result of any action

by FWCS related to this matter. (*Id*. ¶ 18.)

### III.  STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment may be granted only if there are no disputed genuine issues of

material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7ᵗʰ Cir. 2003).  When ruling on a motion for

summary judgment, a court "may not make credibility determinations, weigh the evidence, or

decide which inferences to draw from the facts; these are jobs for a factfinder." *Id*.  The only task

in ruling on a motion for summary judgment is "to decide, based on the evidence of record,

whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst*, 24

F.3d 918, 920 (7ᵗʰ Cir. 1994).  If the evidence is such that a reasonable factfinder could return a

verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337

F.3d at 770.  A court must construe the record in the light most favorable to the nonmoving party

and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as

"summary judgment cannot be used to resolve swearing contests between litigants." *Id.*

However, "a party opposing summary judgment may not rest on the pleadings, but must

affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

### IV.  DISCUSSION

Ulmer argues that FWCS violated her procedural due process rights when it (1)

suspended her without pay pending an investigation and failed to provide a timely post-

suspension hearing, and (2) failed to render a timely decision from her pre-termination hearing.[10]

---

[10]FWCS contends that Ulmer failed to plead that Singleton's delay in rendering her decision gave rise to a
procedural due process violation and, thus, Ulmer's argument is barred.  Regardless, as will be discussed *infra*, this
claim fails on the merits.

11

### A.  Municipality "Policy or Custom" Must Cause Deprivation
### for Liability to Attach under 42 U.S.C. § 1983

As a threshold matter, "[m]unicipalities, including school boards, may not be held liable under § 1983 simply because they employed the tortfeasor acting within the scope of his or her employment." *Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1324 (7th Cir. 1993); *Towers v. City of Chicago*, 173 F.3d 619, 629 n.7 (7th Cir. 1999); *see also Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (emphasizing that a municipality cannot be liable under § 1983 pursuant to a theory of *respondeat superior*); *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468-69 (7th Cir. 2001).  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dept. of Social Serv. of the City of New York*, 436 U.S. 658, 694 (1978).  "In other words, to maintain a § 1983 claim against a municipality, one must establish the requisite culpability (a 'policy or custom' attributable to municipal policymakers) and the requisite causation (the policy or custom was the 'moving force' behind the constitutional deprivation)." *Gable*, 296 F.3d at 537.  A "policy or custom" may be established by showing: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id*.

### B. Ulmer Fails to Establish that a FWCS "Policy or Custom" Caused Her Alleged Violations

Here, interpreting Ulmer's claims generously, Ulmer asserts the "policy or custom" which caused her alleged constitutional violation was: (1) FWCS's express policy of delegating personnel decisions to its employee relations department, and (2) the delay by Singleton, who Ulmer contends holds final policymaking authority on behalf of FWCS, in rendering a decision from the pre-termination hearing. Both of Ulmer's arguments, however, come up short.

### 1. Ulmer Fails to Establish an Express FWCS Policy Caused her Alleged Violations

As to Ulmer's first argument, Ulmer is correct that FWCS has an express policy of delegating its personnel decisions from the Board of Trustees to its employee relations department. *(See* Designation of Evidence in Supp. of Pl.'s Resp. ¶ 3 at 40, ¶ 7 at 4-5.) However, Ulmer fails to show how this delegation *caused* Ulmer's alleged procedural due process violations. Quite to the contrary, it is likely that FWCS employees receive more timely and extensive due process *because* FWCS delegates its personnel matters to a specialized department, rather than allowing such day-to-day administrative decisions to bottleneck with the Board of Trustees. Moreover, Ulmer has produced no evidence which shows that the employee relations department has an express policy or standard that somehow unreasonably delays hearings or obstructs due process in making its personnel decisions; rather, the employee relations department is guided by Employee Standard Practices which expressly incorporate due process provisions in FWCS's employee discipline model. (*See id.* at ¶ 7.) As will be discussed *infra*, the employee relations department offered Ulmer three distinct opportunities to be heard; any alleged delay in the instant action is more convincingly associated with the unique

circumstances associated with Ulmer's accusation and her subsequent filing of this lawsuit, not an express FWCS policy applicable to all employees.

As to Ulmer's second argument, Ulmer has produced no evidence that an express FWCS policy or standard caused Singleton to delay rendering a determination from the pre-termination hearing until the resolution of this action.  Nor does Ulmer show that Singleton routinely delays her decisions when faced with such circumstances, or that she would likely do so again in the future.  Rather, Singleton's decision to delay appears discretionary on her part, made in response to a unique set of facts; that she recently changed her decision in response to Ulmer's contention is further evidence of such discretion.  *Cf. City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality.").  Therefore, Ulmer's argument that Singleton's decision to delay her determination occurred pursuant to an express policy of FWCS fails.

### 2.  Ulmer Fails to Establish that Singleton Holds Final Policymaking Authority for FWCS

Ulmer next argues that FWCS should be liable because Singleton holds final policymaking authority on behalf of FWCS, and the delay of her decision from the pre-termination hearing created a FWCS "policy or custom" which violated Ulmer's constitutional rights.

Status as a policymaker for § 1983 purposes is conferred by state or local law, with final policymaking authority derived directly by statute, or delegated or ratified by an official having policymaking authority. *Kujawski v. Bd. of Comm'rs of Bartholomew County, Ind.*, 183 F.3d 734, 737 (7th Cir. 1999).  When determining § 1983 liability, "[t]he question is whether the

14

promulgator, or the actor, as the case may be--in other words, the decisionmaker--was at the apex of authority for the action in question." *Gernetzke,* 274 F.3d at 468 (holding that the school district was not liable under § 1983 when a school superintendent and principal prohibited the display of a cross in a mural painted by the school's bible club, because the school board, not the school superintendent and principal, held the final decisionmaking authority under law). Stated more fully, to avoid the potential pitfall of lapsing back into some sort of *respondeat superior* theory of liability, "the cases limit municipal liability under section 1983 to situations in which the official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that there is no higher authority." *Id.* at 469.

In this case, the Board of Trustees is granted final policymaking authority for FWCS by statute, inclusive of the power to employ or discharge personnel. *See* Ind. Code §§ 20-5-1-3(b), 20-5-1.5-5, 20-5-2-2.  While the Board delegates certain authority to Singleton, the Board is still her "higher authority" in the school system. *See Gernetzke*, 274 F.3d at 469.  Since Singleton does not hold final policymaking authority on behalf of FWCS, her delay in rendering a decision from Ulmer's hearing fails to establish the "policy or custom" prong required to impose liability on FWCS. *Id.; Harless v. Darr*, 937 F. Supp. 1339, 1349 (S.D. Ind. 1996); *cf. Woods v. City of Mich. City, Ind.*, 940 F.2d 275, 278 (7th Cir. 1991) ("municipal liability under § 1983 attaches where--and only where--a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question"); *Easter House v. Felder*, 910 F.2d 1387, 1403 (7th Cir. 1990) ("Because the state through its designated policymaking branches created its formal policies and procedures, we cannot entertain a claim that the single act of a state employee now

15

reflects the state's established policies and procedures.")

Arguably, if the Board of Trustees had specifically directed Singleton to delay her decision, or ratified her delay in some manner, Ulmer's argument would have more bite. *See Gernetzke*, 274 F.3d at 469, *Harless*, 937 F. Supp. at 1348. However, that is not the case here, as Ulmer has produced no such evidence. Accordingly, Ulmer's assertion that Singleton created a "policy or custom" for FWCS when she delayed rendering her decision from Ulmer's pre-termination hearing is unconvincing.

### C.   Ulmer Also Fails on the Merits to Show that FWCS Violated Her Procedural Due Process Rights

Even if Ulmer had successfully established that her alleged procedural due process violations occurred pursuant to a FWCS "policy or custom," her claim would still fail on the merits.

The Fourteenth Amendment prohibits state actors from depriving "any person of life, liberty, or property, without due process of law." *Schneider v. Bd. of Sch. Tr., Fort Wayne Cmty. Sch.*, 255 F. Supp. 2d 891, 897 (N.D. Ind. 2003) (citing *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 616 (7th Cir. 2002)). FWCS concedes that Ulmer has a property interest in her continued employment with FWCS (Defs.' Mem. in Supp. of their Mot. for Summ. J. at 18); therefore, the question devolves to simply how much process Ulmer was due. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

#### 1.   Ulmer Was Afforded Sufficient Due Process in her Suspension

Ulmer first argues that her procedural due process rights were violated when FWCS suspended her without pay and failed to provide her with a sufficiently prompt post-suspension hearing.

16

The Supreme Court has stated that pre-suspension due process is flexible and calls for such procedural protections as the particular circumstances demand. *Gilbert v. Homar*, 520 U.S. 924, 930 (1997).  In *Gilbert*, a state university employee who was suspended without pay following his arrest on drug-related charges, alleged that the university officials violated his due process rights when they failed to afford him a pre-suspension hearing. *Id*.  The Court, using the balancing test articulated in *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976), stated that where it is impractical to provide pre-suspension due process, or where prompt action is necessary, post-suspension due process is satisfactory.[11] *Id*. at 931-33.  The Court rejected Gilbert's claim, stating that the length and finality of the deprivation in a suspension is of lesser impact on the private interest than a termination, providing that the employee receives a prompt post-suspension hearing, the loss of income is relatively insubstantial and fringe benefits remain unaffected. *Id*. at 934-35; *see also Duncan v. State of Wis. Dept. of Health and Family Serv*., 166 F.3d 930, 935-37 (7th Cir. 1999).

Here, Ulmer was provided with an opportunity to tell her side of the story on December 18, 2003, with a union representative present, *before* Brown suspended her.  Moreover, Ulmer was given a second opportunity to be heard on February 23, 2004, this time with her attorney present, following Brown's initial investigation.  These facts are easily sufficient to satisfy the *Matthews* test.  In applying the first factor of the test, Ulmer's private interest in earning a livelihood is certainly significant, although not as weighty as if she had been terminated. Moreover, the risk of erroneous deprivation of such right was lessened here because Ulmer

---

[11]The factors to be weighed in the *Matthews* balancing test are: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." *Gilbert*, 520 U.S. at 931-32 (quoting *Matthews*, 424 U.S. at 335).

received both a pre-suspension and post-suspension hearing opportunity.  Ultimately, FWCS's interest in keeping an employee accused of a serious crime out of a school setting, especially where credible evidence supports the accusation, tips the scales in FWCS's favor.  Therefore, the steps FWCS took to afford Ulmer due process under the circumstances were more than sufficient, and her claim that she was deprived of procedural due process in regard to her suspension is unfounded.

    2.  <u>To Date, Ulmer Has Been Afforded Sufficient Pre-Termination Due Process</u>

    Ulmer also argues that her procedural due process rights were violated by Singleton failing to promptly render a decision after Ulmer's pre-termination hearing on May 7, 2004.

    In *Cleveland Board of Education v. Loudermill*, the Supreme Court articulated what pre-termination due process must be afforded to a public employee: "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." 470 U.S. 532, 546 (1985).  "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee," provided that sufficient post-termination review mechanisms are available. *Id*.  Moreover, "grievance and arbitration procedures can (and typically do) satisfy the requirements of post-deprivation due process." *Chaney v. Suburban Bus Div. of the Reg'l Transp. Auth.*, 52 F.3d 623, 630 (7th Cir. 1995); *Hudson v. City of Chicago*, 374 F.3d 554, 563 (7th Cir. 2004).

    Indeed, once Brown recommended Ulmer for termination, a formal pre-termination due process hearing was afforded to Ulmer on May 7, 2004, where Ulmer was represented by counsel, offered evidence and witness testimony, and had the opportunity to cross-examine

witnesses.  Wisely, Ulmer does not dispute how the proceedings were conducted; rather, she

contends that the hearing was unconstitutionally delayed because it did not occur until

approximately four and a half months after her suspension.

The Supreme Court stated in *Loudermill* that due process requires only that a hearing

occur "at a meaningful time," and, that while at some point a delay in a post-termination hearing

would become a constitutional violation, a nine-month adjudication is not *per se*

unconstitutionally lengthy. *Loudermill*, 470 at 547.  Later, in *Federal Deposit Insurance Corp. v.

Mallen*, the Court rephrased the three factors comprising the *Matthews* balancing test to further

ferret out the "point" at which a delay becomes unconstitutional: "the importance of the private

interest and the harm to this interest occasioned by the delay; the justification offered by the

Government for delay and its relation to the underlying governmental interest; and the likelihood

that the interim decision may have been mistaken." 486 U.S. 230, 242 (1988) (holding that

where an indicted bank employee did not receive a pre-suspension hearing, a three-month delay

in a post-suspension hearing was not unconstitutional).  Specifically, in *DeVito v. Chicago Park

District*, 972 F.2d 851, 858 (7th Cir. 1992), the court determined that a delay of over one year for

an employee's post-termination hearing was not unconstitutional.  While the court acknowledged

the importance of the plaintiff's ability to earn a living, it determined that an administrative

bottleneck was adequate justification for the delay of the hearing, and the risk of erroneous

decision was reduced because the plaintiff had received a pre-termination hearing. *Id*.

Likewise, applying the *Mallen* factors to the instant case, the analysis weighs in FWCS's

favor.  While Ulmer's property right in her continued employment is certainly significant, she

has presented no evidence of financial hardship; rather, she reports inheriting a significant

19

amount of money recently from her mother's estate.  Furthermore, a good portion of the delay in scheduling the hearings was so that FWCS had ample opportunity to complete a thorough investigation, certainly a well-justified reason for delay, *see Mallen*, 486 U.S. 230 at 244 ("[t]he magnitude of the public interest in a correct decision counsels strongly against any constitutional imperative that might require overly hasty decisionmaking"); any other delay that occurred can largely be attributed equally to the busy schedules of Ulmer's and FWCS's counsel.  Moreover, Ulmer had two prior opportunities to be heard on the matter; therefore, as in *DeVito*, the risk of an erroneous interim decision was lessened.

Similarly, when weighing the *Mallen* factors with regard to Singleton's delay in rendering a decision from the pre-termination hearing, the analysis again comes out in FWCS's favor.  First,  Ulmer's private interest in earning a livelihood is certainly significant, as discussed *supra*, and her harm has increased due to the extended length of her suspension.  Second, the justification for the delay offered by Singleton, that her decision about Ulmer's employment was best deferred to the courts, was likely intended so that Singleton could rule after all of the relevant evidence had been presented; however, Singleton's justification is slightly misplaced, as Ulmer's employment status is a matter for FWCS to decide, not the Court.  Nonetheless, the third factor, the likelihood of a mistaken interim decision, swamps the first two factors in favor of FWCS.  Ulmer had two opportunities to tell her story before the pre-termination hearing, and her almost three-month delay in unearthing her tanning salon alibi does little to rock the evidence that the interim decision was based on.[12]  Moreover, a serious question exists whether

---

[12]The Court acknowledges that if Singleton continues to delay her determination regarding Ulmer's employment status, it could at some "point" rise to a procedural due process violation; however, to date that "point" has not yet been reached. *See Mallen*, 486 U.S. at 242.

Ulmer even adequately pled that her procedural due process rights were violated by Singleton's delay in rendering a decision from the pre-termination hearing, as this argument was only specifically articulated in Ulmer's response brief. (Am. Compl. ¶¶ 1, 28; Resp. Mem. in Opp'n to Def.'s Mot. for Summ. J.); *see Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989) (holding that a complaint may not be amended by the briefs in opposition to a motion to dismiss).   Therefore, Ulmer's claim that her procedural due process rights were violated by Singleton failing to promptly render a decision after the pre-termination hearing fails.

### C.  Ulmer Has Abandoned Her Claim of Alleged Injury to Her Reputation

Ulmer initially also asserted a claim under Article One, Section Twelve of the Indiana Constitution for alleged injury to her reputation caused by actions of FWCS relating to the suspension.  A claim under this provision of the Indiana Constitution is analyzed under the same methodology as a federal due process claim. *Doe v. O'Connor*, 790 N.E.2d 985, 988 (Ind. 2003); *see also McIntosh v. Melroe Co., a Div. of Clark Equip. Co., Inc.*, 729 N.E.2d 972, 976 (Ind. 2000); *McKinney v. McKinney*, 820 N.E.2d 682, 698 (Ind. Ct. App. 2005).  Therefore, Ulmer's claim that her state constitutional rights were violated also fails.  Moreover, Ulmer has failed to argue or further support this claim in her response to the motion for summary judgment; therefore, the Court deems that she has abandoned this claim. *E.g., Palmer v. Marion County*,

21

327 F.3d 588, 597-98 (7th Cir. 2003).

## V.  CONCLUSION

In summary, Ulmer has had sufficient opportunity to tell her side of the story, and even if she had not, FWCS could not be held liable because the alleged deprivation was not caused by a FWCS "policy or custom."  Therefore, Defendants' motion for summary judgment is hereby GRANTED.  The Clerk is directed to enter a judgment in favor of Defendants and against Plaintiff.

Enter for July 18, 2005.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

22